**HARDIN'S BAKERY, INC.,**
Plaintiff–Appellee,

v.

**RETAIL, WHOLESALE, AND DEPART-MENT STORE; UNION, AFL–CIO, and United Bakery and Confectionery Workers Union, Local No. 441, Defen-dants–Appellants.**

No. 88–7469.

United States Court of Appeals,
Eleventh Circuit.

July 25, 1989.

George C. Longshore, Birmingham, Ala., for defendants-appellants.

John K. Anderson and Kevin P. Hishta, Arnold & Anderson, Atlanta, Ga., for plaintiff-appellee.

Before KRAVITCH and COX, Circuit Judges, and MORGAN, Senior Circuit Judge.

COX, Circuit Judge:

Hardin's Bakery (Hardin's) filed this action seeking to have set aside an arbitrator's award in favor of the United Bakery and Confectionery Workers Union Local 441 (the Union). The district court, having granted Hardin's motion for summary judgment, entered final judgment vacating the arbitrator's decision. We now consider the Union's appeal from that judgment.

## I.

Flowers Industries manufactures and distributes baked goods throughout the southern United States via an amalgamation of wholly-owned subsidiaries. In Alabama, Flowers Industries conducts business through Flowers of Alabama. Hardin's is, and Flowers of Birmingham was, a subsidiary of Flowers of Alabama. Each of the subsidiaries operates independently. A transfer of finished products or raw materials from Flowers of Birmingham to Hardin's, for instance, was not accounted for by mere credits and debits on the ledger of the parent corporation; rather, the transaction was treated as an arms-length sale by Flowers of Birmingham to Hardin's. The subsidiaries, moreover, independently establish labor relations policy. Each corporation negotiates separately with the union representing its employees and executes the collective bargaining agreement, applicable only to its employees, in its own corporate identity.

Flowers of Birmingham, as its name suggests, was the Flowers of Alabama subsidiary responsible for baking and distributing bread in the Birmingham, Alabama market. Employees of its bakery and seven thrift stores elected the Union as their bargaining representative and, following negotiations, Flowers of Birmingham and the Union entered into a collective bargaining agreement. In May 1986, the initial agreement expired. During renegotiation of the agreement, management advised the Union representatives that the antiquated bakery was unprofitable; economic efficiency could not be achieved without significant capital expenditures on structural modifications and modern equipment. The Union was warned that a strike during this dismal financial period could force Flowers of Birmingham to cease production and close permanently.

The Birmingham subsidiary's financial troubles continued; losses were greater than expected, and the costs of moderniza-

tion were prohibitive. In anticipation of the inevitable financial collapse, a vice-president of Flowers of Birmingham contacted the president of Hardin's, the Flowers of Alabama subsidiary in nearby Tuscaloosa, Alabama, to forewarn that Hardin's soon would have to increase production and assume sole responsibility for distributing Flowers Industries' products in the Birmingham market.

Thereafter, but two weeks before Flowers of Birmingham ceased production, Hardin's negotiated with two individuals, Brasher and McClain, who were interested in acquiring the right to operate the seven Birmingham thrift stores on an independent contract basis, a business arrangement that successfully had been implemented by a Flowers Industries subsidiary in Georgia. Both Brasher and McClain were management level employees at Flowers of Birmingham. An accord was reached, and corporate counsel for Flowers Industries drafted the "Purchase and Operating Agreement." Several provisions of that contract indicate that the independent contractors would assume complete responsibility for labor/management relations. The contract discloses, moreover, that the employees chosen by the independent contractors to operate the thrift stores would not be employees of Hardin's.

Flowers of Birmingham also advised the Union and a group of representative employees, including two thrift store employees, of the impending cessation of operations at the Birmingham bakery and of the sale of the thrift stores. The purchasers of the thrift stores, the group was told, would hire their own employees; accordingly, all Flowers' thrift store employees would be terminated. This notice, which came ten days prior to Flowers' final day as operator of the Birmingham thrift stores, spread quickly throughout the Flowers of Birmingham plant and stores. The thrift store employees soon discovered that one of the buyers was a manager at a Flowers of Birmingham thrift store. Despite this knowledge, however, none of the Flowers'

thrift store employees applied for a job with the buyers, and only one sought a transfer to a thrift store in another city. Four Flowers' drivers and one production line employee, on the other hand, applied for employment with Hardin's; all were subsequently hired.

November 22, 1986, was the final day of production at the Birmingham bakery and, consequently, the day that the fifty-five production employees were terminated. The following day the thrift stores closed, and the fifteen employees of the thrift stores met with a similar fate. Following assignment of the Flowers of Birmingham assets to Hardin's, Hardin's finalized plans to sell the right to operate the Birmingham thrift stores to the independent contractors. On November 24, 1986, the thrift stores reopened under new management and were staffed entirely by a work force consisting of non-union employees hired by the independent contractors. The stores, still bearing the Flowers Industries' logo, were stocked with dated bread as they had been under Flowers of Birmingham management. The bread, however, was baked by Hardin's in Tuscaloosa rather than Flowers of Birmingham.

Although all of the production and distribution functions once performed by Flowers of Birmingham had been assigned to Hardin's, Flowers of Birmingham legally still existed. Five months after Flowers collapsed, the boards of directors of Flowers of Birmingham and Hardin's voted to merge the corporations in order to eliminate the unnecessary corporate entity. Accordingly, following issuance of a certificate of merger by the Secretary of State, Hardin's, as the surviving corporation, assumed responsibility for the outstanding liabilities of Flowers of Birmingham pursuant to Ala.Code § 10–2A–145(b)(5) (1975).

Within several days of the closing of the bakery and the thrift stores, the Union filed a grievance against Flowers of Birmingham protesting the termination of the employees.[1] This grievance preceded the

1. The Union contended that Flowers of Birmingham had not discontinued production and

distribution, but, instead, had subcontracted

Hardin's/Flowers of Birmingham merger. Pursuant to the collective bargaining agreement between Flowers of Birmingham and the Union, the grievance was submitted to arbitration. Hardin's appeared at the arbitration hearing, which was held nine months after the grievance was filed, specifically declaring that the sole reason for its presence was the intervening merger and the obligations imposed by the Alabama statute governing mergers.

The arbitrator found that Flowers of Birmingham did not violate the collective bargaining agreement by closing the bakery,[2] but that "Flowers of Birmingham and Hardin's Bakery violated the 1986 Agreement when either or both transferred control of the thrift stores to the individuals." [3] This latter finding was based on evidence that the Flowers of Birmingham thrift store employees were parties to a collective bargaining agreement while the employees of Hardin's thrift stores in Tuscaloosa were not, and the arbitrator's conclusion from that evidence that Hardin's transfer of the thrift stores was a subcontract motivated in large part by anti-union animus. Hardin's must bear the liability, the arbitrator declared, whether by virtue of its own breach of the 1986 collective bargaining agreement or its statutory responsibility for the liabilities of Flowers of Birmingham. Accordingly, the arbitrator ordered Hardin's to rescind its contractual relationship with the independent contractors, hire the former employees of the Flowers of Birmingham thrift stores, and pay back wages.

Hardin's filed a complaint in district court pursuant to section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185 (1978), praying that the arbitrator's award be vacated. In its motion for summary judgment, Hardin's argued that the arbitrator exceeded his authority by imposing the Flowers' collective bargaining agreement upon Hardin's. The district court, finding no substantial continuity of the Flowers of Birmingham business enterprise across the change in ownership, *see John Wiley & Sons v. Livingston*, 376 U.S. 543, 551, 84 S.Ct. 909, 915, 11 L.Ed.2d 898 (1964), agreed and entered judgment accordingly. The Union appeals.

## II.

■ The Union's challenge to the judgment below begins with its assertion that the district court erroneously applied a heightened level of scrutiny to the arbitrator's assumption of jurisdiction over Hardin's. Specifically, the Union asserts that Hardin's waived its right to a de novo judicial determination of substantive arbitrability by voluntarily submitting the issue to the arbitrator for final and binding resolution. This contention is premised on Hardin's statement of the issues during its opening argument to the arbitrator, the first of which was phrased as follows: "[W]hether this matter is properly a matter to be decided by an arbitrator, i.e., whether this dispute is substantively arbitrable." Consequently, so the argument goes, judicial review of the arbitrator's award is narrowly circumscribed. *See George Day Const. v. United Brotherhood of Carpenters & Joiners of America Local 354*, 722 F.2d 1471, 1476 (3d Cir.1984). Hardin's counters by noting that it appeared at the arbitration hearing solely as a consequence of its statutory obligation as successor to Flowers of Birmingham and that the issue raised during arbitration thus was limited in scope to arbitrability of the dispute as to Flowers of Birmingham. The question of the arbitrator's jurisdiction over Hardin's, it is asserted, was not an issue submitted to arbitration.

those operations in violation of the 1986 collective bargaining agreement.

**2.** The Union did not seek review of that adverse decision.

**3.** Throughout his opinion, the arbitrator was not specific about which corporation transferred control of the thrift stores; reference to the responsible party was always in the disjunctive. While discussing Hardin's liability under the merger statute, however, the arbitrator stated that "the evidence in the present case is that Hardin's Bakery—not Flowers of Birmingham—transferred control of the Thrift Stores ... in violation of the 1986 Agreement...." The arbitrator found that Flowers of Birmingham had closed the thrift stores.

■ Arbitration long has been the favored method of resolving labor disputes. *See United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 566, 80 S.Ct. 1343, 1345, 4 L.Ed.2d 1403 (1960); 29 U.S.C. § 173(d) (1978). An arbitrator's award, therefore, is not subject to plenary judicial review for "the federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the award." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960); *Piggly Wiggly Operators' Warehouse v. Piggly Wiggly Operators' Warehouse Indep. Truck Drivers Union Local No. 1*, 611 F.2d 580, 583 (5th Cir.1980). This deference to arbitration does not bestow on arbitrators carte blanche, however. *Piggly Wiggly Operators' Warehouse*, 611 F.2d at 583. Rather, an arbitrator can bind the parties only on those issues they have agreed to submit to arbitration, *Piggly Wiggly Operators' Warehouse*, 611 F.2d at 583; *see United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960).

Although arbitrability of a dispute ordinarily is a matter for judicial determination, *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643 at 650, 106 S.Ct. 1415 at 1419, 89 L.Ed.2d 648 (1986), even that issue is beyond the courts' scrutiny if the parties clearly and unmistakably have vested in the arbitrator the authority to decide the question of arbitrability. *Id.; Warrior & Gulf Navigation*, 363 U.S. at 583 n. 7, 80 S.Ct. at 1353 n. 7. Our initial inquiry, therefore, is whether the issue of substantive arbitrability was submitted to arbitration.

Hardin's contention that its submission of the issue was limited in scope to Flowers' contractual obligation to arbitrate the dispute is well-taken. Prior to publication of the arbitrator's opinion, the arbitration focused solely on Flowers of Birmingham. In the Grievance Report protesting termination of the employees represented by it, the Union implicated Flowers of Birmingham, but not Hardin's. Flowers of Birmingham, responding to the allegations contained in the report, specifically denied the arbitrability of the Union's grievance. That response raised the issue of substantive arbitrability and vividly limited it to Flowers' duty to arbitrate.

Throughout the arbitration hearing, moreover, it was evident that Flowers' liability under the arbitration clause of the collective bargaining agreement was the only arbitrability issue being argued. At the outset, Hardin's attorney explained the reason for his presence, stating that he was "appearing here today because of the requirements of Alabama law which state that ... a company that has had another company merged into it must appear to defend outstanding lawsuits or claims." This declaration immediately precedes Hardin's statement of the first issue submitted to arbitration—substantive arbitrability.

The Union, as grievant, bears the burden of clearly demonstrating that the parties vested in the arbitrator the power to determine the arbitrability of the dispute. *Warrior & Gulf Navigation*, 363 U.S. at 582, 80 S.Ct. at 1352; *Piggly Wiggly Operators' Warehouse*, 611 F.2d at 584. It is evident that the issue—whether the Union's grievance was arbitrable as to Flowers of Birmingham under the arbitration agreement—was argued and submitted to the arbitrator for decision. On the other hand, the Union's demonstration in support of its contention that the arbitrator also was empowered to decide Hardin's contractual obligation to arbitrate is, in light of the conduct of the parties in the arbitration setting, far from clear. Accordingly, we hold that the district court did not err by reviewing de novo the arbitrator's assumption of jurisdiction over Hardin's.

### III.

Having concluded that the district court owed no deference to the arbitrator's decision regarding substantive arbitrability of the grievance as to Hardin's, we review the district court's conclusion that Hardin's is not obligated to arbitrate under the 1986 collective bargaining agreement between Flowers of Birmingham and the Union.

The Union argues that Hardin's is a successor employer bound by the collective bargaining agreement. Alternatively, the Union contends that Hardin's impliedly adopted the labor agreement.[4] We disagree with both contentions.

### A.

The issue which the Union's first argument raises is necessarily a limited one for the question—whether Hardin's is a successor—is simply not meaningful in the abstract. *See Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 262 n. 9, 94 S.Ct. 2236, 2243 n. 9, 41 L.Ed.2d 46 (1974). We must decide whether Hardin's is a successor in the sense that it is obligated to abide by the terms of the collective bargaining agreement between Flowers of Birmingham and the Union, but must avoid deciding whether Hardin's is a successor for any other purpose. Our resolution of this narrow successorship question is controlled by federal labor law rather than state corporate law. *John Wiley & Sons v. Livingston,* 376 U.S. 543, 548, 84 S.Ct. 909, 913, 11 L.Ed.2d 898 (1964).

In *John Wiley & Sons v. Livingston,* the union representing the employees of a corporation which had disappeared through a merger sought to compel the surviving corporation, which had hired all of the merged corporation's employees and continued to operate the enterprise in a substantially identical form after the merger, to arbitrate under the merged corporation's collective bargaining agreement. The Court, in its initial encounter with the successorship issue, held that "the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement." 376 U.S. at 548, 84 S.Ct. at 914. The duty to arbitrate survives, the Court opined, except in those

cases "in which the lack of any substantial continuity of identity in the business enterprise before and after a change would make a duty to arbitrate something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." *Id.* at 551, 84 S.Ct. at 915. Although the *Wiley* court did not attempt to define the requisites of continuity or the criteria for successorship, it did enunciate the standard under which it would judge future successorship cases.

The Court's subsequent decision in *NLRB v. Burns Int'l. Detective Agency,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), which arose in the context of an unfair labor practice proceeding against a new employer for its refusal to bargain with the union elected by the predecessor's employees, has been referred to as "the centerpiece of successorship law." 2 C. Morris, The Developing Labor Law, 697 (2d ed. 1983). In *Burns,* the Court articulated what have become the criteria for determining whether a new employer is a "successor." The factors upon which the Court upheld the bargaining obligation of the new employer were that the "bargaining unit remained unchanged and a majority of the employees hired by the new employer [were] represented by a recently certified bargaining agent...." 406 U.S. at 281, 92 S.Ct. at 1579. It would have been a different case, the Court noted, if the new employer's operational structure and practices had differed from the predecessor's so that the bargaining unit was no longer appropriate, or if the new employer had exercised its right to assemble a work force, a majority of which did not consist of the predecessor's employees. *Id.* at 280–81, 92 S.Ct. at 1578–79. Consideration of the number of the predecessor's employees hired by the new employer is a relevant factor since nothing in the federal labor laws requires that the new employer hire all of the em-

---

4. The Union also argues that the district court failed to consider Hardin's statutory responsibility for the pre-merger liabilities of Flowers of Birmingham. In footnote 4 of his opinion, however, Judge Pointer agreed with Hardin's argument that statutory merger liability was not applicable in this case because the arbitrator ultimately found that Hardin's—not Flowers—had transferred the thrift stores to the independent contractors. There is nothing enigmatic or incorrect about that conclusion.

ployees of the predecessor. *Id.* at 280 n. 5, 92 S.Ct. at 1578 n. 5.

A decade after *Wiley*, the Court, recognizing the emphasis that it and many lower courts had placed on whether the successor employer hires a majority of the predecessor's employees, and adhering to its reasoning in *Burns*, stated that the "continuity of identity in the business enterprise *necessarily* includes, we think, a substantial continuity in the identity of the work force across the change in ownership." *Howard Johnson Co. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 263, 94 S.Ct. 2236, 2244, 41 L.Ed.2d 46 (1974) (emphasis added). Because Howard Johnson, following the purchase of the assets of its franchisee, had retained only nine of the fifty-three former employees of the franchisee, the Court did not compel arbitration of the grievance brought under the franchisee's contract with the union.

■ Continuity of the work force remains the predominant focus of the successorship inquiry. In its most recent pronouncement on the subject, the Supreme Court, in a *Burns*-type case, reaffirmed the importance of the continuity of the work force. *See Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). It recognized, however, that the *Burns* formulation—whether a majority of the new employer's work force was hired from the ranks of the predecessor's employees—conflicts with the *Howard Johnson* formulation—whether the new employer retained a majority of

the predecessor's employees. It did not resolve the conflict, however, since resolution of the issue would not have affected the outcome of the case. *Id.* 107 S.Ct. at 2237 n. 12.

■ The successorship analysis developed in *Wiley* and its progeny governs Hardin's duty to arbitrate the Union's grievance.[5] We must decide, therefore, whether there is continuity of identity between Flowers of Birmingham and Hardin's across the change in ownership. The paramount criterion is the continuity of the work force. *See Howard Johnson*, 417 U.S. at 263, 94 S.Ct. at 2243; 2 C. Morris, The Developing Labor Law 713 (2d ed. 1983). Also significant, however, is the continuity in the operation of the business enterprise, a factual inquiry based upon the totality of the circumstances of a given situation. *See Fall River*, 107 S.Ct. at 2236.

Clearly, since none of the Union employees survived the change in ownership, there is no continuity in the identity of the work force. The fifteen former thrift store employees were not a majority of the seventy Flowers of Birmingham employees, and, even if Hardin's had retained control of the Birmingham thrift stores and hired all fifteen employees discharged by Flowers of Birmingham, the fifteen would not have formed a majority of Hardin's employees. Regardless of the focus of the analysis, be it the predecessor's work force as in *Burns* or the new employer's work force as in *Howard Johnson*, the Union

---

5. Whether there is continuity of identity across the change in ownership has been the issue in a myriad of successorship cases regardless of the nature of the lawsuit, be it a section 301 suit to compel arbitration, as in *Wiley* and *Howard Johnson*, or an appeal from a determination by the NLRB in an unfair labor practice proceeding, as in *Burns* and *Fall River*. The Supreme Court has stated, moreover, that the successorship determination does not ordinarily depend on the distinction between mergers, consolidations, or purchases of assets. *Howard Johnson*, 417 U.S. at 257, 94 S.Ct. at 2240.

The corporate reorganization in this case is a hybrid of those mentioned in *Howard Johnson*, and the nature of this lawsuit is, in effect, a section 301 suit to compel arbitration. Therefore, the continuity of identity test is controlling. *See Monroe Sander Corp. v. Livingston*, 377 F.2d 6 (2d Cir.1967) (The Second Circuit, in this pre-*Howard Johnson* case, applied the continuity of identity test to facts similar to those before this court.). Each of the parties have argued, moreover, that *Wiley* and its progeny apply.

fails the continuity of identity test. Under these circumstances, the arbitrator's conclusion that Hardin's transfer of the thrift stores was motivated by animosity toward the Union is not highly relevant to our successorship inquiry.

There is, as the Union stresses, continuity in the operation of the thrift stores. Their appearance, purpose, and physical operation are essentially the same as under Flowers of Birmingham management. To require Hardin's to arbitrate these grievances on this basis alone, however, would require that we ignore the lack of continuity in the work force and the fact that Hardin's neither terminated the Flowers of Birmingham employees nor hired the nonunion staff. Moreover, we would have to give credence to the Union's pervasive argument that its members have the right to do the work as long as the work is done. This we refuse to do, for it is a tenet of labor relations law that "[t]he employees of the terminating employer have no legal right to continued employment with the new employer...." *Howard Johnson*, 417 U.S. at 264, 94 S.Ct. at 2244. Accordingly, we hold that the district court correctly concluded that there is no substantial continuity of identity between Flowers of Birmingham and Hardin's such that the duty to arbitrate survived.[6]

### B.

█ It is undisputed that Hardin's did not expressly adopt the labor contract. The Union contends, however, that prior to termination of the union employees there occurred an "implied assignment" of the Flowers' assets to Hardin's and an "operational merger" between the two corporations. By its conduct, the Union argues, Hardin's impliedly adopted Flowers' con-

tractual obligations under the 1986 collective bargaining agreement. The only conduct which the Union cites in support of this argument is Hardin's negotiations with the independent contractors before the thrift stores were closed. We, like the district court, find those negotiations insignificant to the issue and reject this argument as meritless.

### IV.

Since there was no substantial continuity of the identity of the Flowers of Birmingham business enterprise across the change in ownership of the thrift stores, and no express or implied assumption by Hardin's of the collective bargaining agreement, the district court did not err by vacating the arbitrator's award.

AFFIRMED.

KRAVITCH, Circuit Judge, dissenting:

In order to hold Hardin's liable to the terms of Flowers of Birmingham's labor contract, the majority reasons that Hardin's must be deemed a "successor corporation" of Flowers of Birmingham. Because there was no "substantial continuity of the workforce," the majority concludes that Hardin's was not a successor corporation.

The majority disregards an issue that distinguishes this case from *Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987); *Howard Johnson Co. v. Detroit Local*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *N.L.R.B. v. Burns International Security Services*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); and *John Wiley & Sons v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).[1] As developed in these Supreme

---

**6.** Our holding is limited to the specific facts of this case, *see Howard Johnson*, 417 U.S. at 256, 94 S.Ct. at 2240 (case by case approach particularly appropriate in light of the difficulty of the successorship question), and should not be cited as authority for the proposition that a parent corporation can manipulate its wholly-owned subsidiaries in order to avoid unfavorable labor

contracts. There is no evidence of such manipulation in this case.

**1.** Because I conclude as a matter of federal law that Hardin's was responsible for the labor obligations of Flowers of Birmingham, I do not address the question presented in Part II of the majority opinion.

Court cases, the successor-corporation doctrine determines whether labor contracts continue to exist after a transaction involving two economically independent employers. *See Fall River,* 107 S.Ct. at 2230 (corporation purchased assets of liquidated corporation); *Howard Johnson,* 417 U.S. at 250, 94 S.Ct. at 2237 (corporation made bona fide purchase of assets of restaurant and motor lodge); *Burns,* 406 U.S. at 275, 92 S.Ct. at 1576 (corporation was an independent contractor hired after principal determined not to contract with former independent contractor); *John Wiley,* 376 U.S. at 545, 84 S.Ct. at 912 (two formerly independent companies merged for genuine business reasons). In the instant case, by contrast, one wholly owned subsidiary merely transferred operations to a sister corporation, another wholly owned subsidiary, without payment of consideration. The question here presented is whether a company can rid itself of a bothersome set of labor obligations merely by arranging for its management employees to execute a few legal documents; the majority's statement that no evidence showed the parent corporation's "manipulation" of its subsidiaries, *ante* note 6, disregards the fact that a wholly owned subsidiary is completely subservient to the desires of its parent.

The transaction under scrutiny was an intra-company rearrangement—only on paper did one corporation succeed another; ownership and control remained in Flowers Industries throughout. *See Southport Petroleum Co. v. N.L.R.B.,* 315 U.S. 100, 106, 62 S.Ct. 452, 456, 86 L.Ed. 718 (1942) ("If there was merely a change in name or in apparent control there is no reason to grant the petitioner relief from the Board's order of reinstatement; instead there is added ground for compelling obedience.... [A] bona fide discontinuance and a true change of ownership ... would terminate the duty of reinstatement created by the Board's order...."). Contrary to Supreme Court authority, the majority's holding per-

mits a corporation to absolve itself of labor obligations through clever bookkeeping; this result seriously impairs the mutuality of obligation in labor law. *See Howard Johnson,* 417 U.S. at 259 n. 5, 94 S.Ct. at 2242 n. 5 (in cases that "involve a mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management[,] ... the courts have had little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor"). Although the majority notes that transactions between two Flowers companies are labelled "sales" and "purchases" rather than "debits" and "credits," and that the subsidiaries are responsible for labor relations in their local market, these are slender reeds to support a finding that Flowers of Birmingham and Hardin's functioned as independent economic entities for the purpose of resolving the important issue of labor-contract continuity. Moreover, in light of the *Howard Johnson* Court's recognition that an occasional corporation will undergo a "mere technical change" in order "to avoid the effect of the labor laws," I think it highly relevant that the arbitrator found Hardin's transfer of the thrift stores to have been driven by anti-union animus. *Cf. ante* p. 1547.

I doubt that the Supreme Court's reasoning in *Howard Johnson* even speaks to the question of workforce continuity under the present circumstances. *See id.,* 417 U.S. at 263, 94 S.Ct. at 2244 ("continuity of identity in the business enterprise necessarily includes, we think, a substantial continuity in the identity of the work force across the change in *ownership*") (emphasis supplied). In *Howard Johnson,* the union sought ultimately to force the employer to hire union employees discharged after Howard Johnson purchased the assets of an indepen-

dently owned franchise. The Court responded as follows:

> What the Union seeks here is completely at odds with the basic principles this Court elaborated in *Burns*. We found there that nothing in the federal labor laws "requires that an employer ... who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be assumed by the employer." [Citations]. *Burns* emphasized that "[a] potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, ... and nature of supervision." [Citations].

417 U.S. at 261, 94 S.Ct. at 2243. Unlike *Howard Johnson* (or *Fall River, Burns,* or *John Wiley*), the transaction here under review was not conducted at arm's length and the problem of the white knight's willingness to rescue a failing corporation is not present. Flowers Industries had a substantial economic interest in making the Birmingham operation more profitable; this interest would continue whether or not the Birmingham operation was bound by a labor contract.

I therefore respectfully dissent.