MADISON HOTEL, Appellee,

v.

HOTEL AND RESTAURANT
EMPLOYEES, LOCAL 25,
AFL–CIO, Appellant.

No. 96–7270.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 11, 1997.

Decided Nov. 7, 1997.

Mady Gilson argued the cause for the appellant. David M. Silberman and Francis R. Sheed, Washington, DC, were on brief.

Jonathan W. Greenbaum, Washington, DC, argued the cause for appellee.

Before: SENTELLE, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

Dissenting opinion filed by Circuit Judge RANDOLPH.

KAREN LECRAFT HENDERSON, Circuit Judge:

Appellant Hotel and Restaurant Employees Local 25 (Union) seeks reversal of the district court's summary judgment vacating two awards of the Arbitrator in the Union's favor. Because we agree with the district court that the awards exceeded the scope of the Arbitrator's authority, we affirm the judgment.

The facts, as found by the Arbitrator, are undisputed. In July 1992 the Madison Hotel (Hotel) eliminated its food service bus positions and shifted bus responsibilities to its waiters. The Union, which represented a bargaining unit that included the Hotel's

waiters and bus employees, filed a grievance on behalf of the laid-off employees. On July 24, 1992 the grievance was submitted to arbitration pursuant to the collective bargaining agreement.

On January 2, 1994 the Arbitrator issued a decision in favor of the grievants. In the decision the Arbitrator framed the "issue" as follows:

Whether the Hotel violated the Agreement by its abolishment of the Bus Employee position, its transfer of the duties of the Bus Employees to other positions and its layoff of the Grievants in July 1992 and, if so, what is the appropriate remedy?

JA 19. The Arbitrator balanced the Hotel's management rights under the collective bargaining agreement[1] against "those provisions which are of great importance to the employees who have worked at the Hotel for many years, i.e. provisions which afford employees rights in the matters of seniority, classification, layoff projections, retention of seniority following a layoff, etc," JA 32.[2] He concluded: "For the Hotel to take the drastic action of not just laying off employees during the period of slack business, as contemplated by the Agreement, but to instead completely eliminate their positions and reassign substantially all of their remaining duties to another position, the Hotel must demonstrate a legitimate business reason, i.e., a reason beyond mere 'slackness of business,'" a showing he determined the Hotel had not made. JA 32. Accordingly, the Arbitrator ordered the following remedy:

The Hotel is directed to reinstate the Grievants to their former positions and to make them whole for all losses, including seniority, attributable to their improper

---

1. The "Management Rights" provision of the agreement grants the Hotel "the sole right to direct and control the employees, including the right to layoff, promote and transfer." JA 32. Construing this language, the Arbitrator concluded "it properly may be implied in the absence of express restrictions elsewhere in the Agreement, that the Hotel can reassign duties from one position to another, even to the extent of completely eliminating one position." Id.

2. The Arbitrator specifically cited section 12.2(a) of the collective bargaining agreement which provides:

(a) It is recognized that the principle of seniority shall normally be followed when it becomes necessary to layoff [sic] employees due to slackness of business.

JA 78. Section 12.2(b) explains section 12.2(a):

(b) That is, normally, the employee on duty in the station in which the reduction is being made having a shorter period of continuous service shall be laid off before any other employee having a longer period of continuous service; and preference to laid off employees shall be given in reemployment within the particular station or category.

Id.

layoff. Pursuant to the Parties [sic] agreement to bifurcate this proceeding, the Parties are directed to attempt to resolve this matter and, if unsuccessful, either Party may return this matter to the Arbitrator for further proceedings with respect to the remedial aspects only.

JA 36.

When it turned out that none of the grieving bus employees desired reinstatement,[3] the Hotel took the position that the dispute was at an end while the Union insisted that the Arbitrator's award required that the bus positions be reestablished and filled by new employees. On December 14, 1994 the Union wrote the Arbitrator requesting "clarification" of the matter. After receiving a response from the Hotel, the Arbitrator decided by letter dated February 6, 1995 that, despite the mootness of the bus employees' grievance, the Hotel was required to reestablish the positions because his original decision treated the abolition of positions and the layoff of the grievants as separate elements in both the statement of the "issue," which characterized them as distinct violations of the agreement, and the remedy, which "necessarily" contemplated that the positions be reestablished before the employee grievants were reinstated. The Arbitrator then concluded:

> At the point of offering each identified Grievant reinstatement to the restored Bus Employee positions, if any such offer to fill one of these restored positions is not accepted by a Grievant, such restored position becomes a vacancy subject to being filled in accordance with the applicable provisions of the Agreement. A restored position cannot be eliminated solely because a Grievant elected not to accept the offer to be reinstated in such position.

JA 39.

On April 18, 1995 the Union filed an action in the district court to enforce the Arbitrator's award. On February 13, 1996 the district court dismissed the action for lack of jurisdiction, concluding it was "not ripe for adjudication" because the Arbitrator had "not issued a final remedial order." 955 F.Supp. at 2.

On June 6, 1996 the Arbitrator issued a final remedial order, reaching the same conclusion as he had in the February 6, 1995 letter. The Arbitrator again asserted that his statement of the "issue" in his original (January 2, 1994) decision treated separately the abolition of positions and the layoff of the grievants. He then characterized the original remedy as "an attempt to recreate the *status quo ante* the Hotel's violation of the Agreement," namely "restaurant and Room Service facilities which operated with Bus Employees," JA 48, and observed that "the Hotel never has returned to the *status quo ante*," JA 49. The Arbitrator determined that his original decision had "necessarily found that the bargaining unit employees generally, as well as the specific individuals who filed the grievance, have a seniority right to have as many positions in the bargaining unit as possible in which to bump in the event of an economic layoff pursuant to the provisions of Article 12, Section 12.2(a)" of the collective bargaining agreement. JA 48. According to the Arbitrator, "[t]he Union, as the representative of all of the unit employees, has an interest in protecting the seniority rights of all of the unit employees and preserved its right to do so in this case by raising in this grievance the issue of the abolishment of the classification as well as the layoff of the particular Grievants." JA 48. Finally, the Arbitrator stated: "The Hotel … has not identified any 'changed circumstances', other than the passage of time, nor has the Hotel identified any legitimate business reasons which occurred since the classifications improperly were abolished which after-the violation business reasons, arguably, would mitigate against a remedial order requiring the Hotel to reinstate the classification and to fill it until such time as the Hotel has a proper justification for abolishing it." JA 49. The Arbitrator then issued the following final award:

> The Hotel is directed to reinstate the Bus Employee classification for its restaurant

---

3. Most of the grievants had accepted a monetary award in lieu of reinstatement pursuant to a settlement in an unrelated employment discrimination action against the Hotel. Other grievants had obtained employment on the Hotel's staff of waiters.

outlets and for its Room Service operations and to fill the number of Bus Employee positions in each area which existed at the time of the layoff and to operate with such Bus Employee classifications until it can demonstrate an appropriate basis, under the Agreement, to abolish such positions. JA 49.

■ On June 20, 1996 the Hotel filed an action to vacate the Arbitrator's award and the Union counterclaimed for enforcement. On cross-motions for summary judgment, the district court granted judgment in the Hotel's favor on December 17, 1996, concluding that the Arbitrator "exceeded the scope of his jurisdiction, both by deviating from the issues submitted for arbitration and by issuing an award that does not draw its essence from the parties' agreement." *Madison Hotel v. Hotel & Restaurant Employees Local 25*, 955 F.Supp. 1, 3 (D.D.C.1996). The Union appeals the judgment. We conclude that the district court correctly held the Arbitrator's final award went beyond the scope of his authority, which was limited to arbitrating the laid-off bus employees' grievance.[4]

■ The "scope of review of an arbitrator's award interpreting a collective bargaining agreement is extremely narrow." *American Postal Workers Union v. United States Postal Serv.*, 52 F.3d 359, 361 (D.C.Cir.1995) (citing *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 567, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S.Ct. 1347, 1350–51, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)). " '[A] labor arbitration award must be enforced if the arbitrator acts within the confines of his jurisdiction and his award draws its essence from the parties' collective bargaining agreement; this is so even when a reviewing court disagrees with the arbitrator's judgment on the merits.' " *United States Postal Serv. v. National Ass'n of Let-*

*ter Carriers*, 810 F.2d 1239, 1241 (D.C.Cir. 1987) (quoting *Northwest Airlines v. Air Line Pilots Ass'n*, 808 F.2d 76, 78 (D.C.Cir. 1987), *cert. denied*, 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988)). Nevertheless, " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers v. Warrior & Gulf*, 363 U.S. at 582, 80 S.Ct. at 1353); *see Davis v. Chevy Chase Fin. Ltd.*, 667 F.2d 160, 165 (D.C.Cir.1981) (citing *United Steelworkers v. Warrior & Gulf*, 363 U.S. at 582, 80 S.Ct. at 1352–53) ("[A]rbitration is, however, a matter of contract, and the contours of the arbitrator's authority in a given case are determined by reference to the arbitral agreement."). Thus, "[t]here is no duty to arbitrate matters not subject to the arbitration agreement, and no authority on the part of arbitrators to consider matters not necessary to the resolution of disputes actually submitted." *Williams v. E.F. Hutton & Co.*, 753 F.2d 117, 119 (D.C.Cir.1985) (citing *Davis*, 667 F.2d at 165). "In determining the scope of an arbitrator's authority we look to two sources: the collective bargaining agreement, and the submission of the parties to the arbitrator." *Washington–Baltimore Newspaper Guild, Local 35 v. Washington Post Co.*, 442 F.2d 1234, 1236 (D.C.Cir.1971); *see also Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Indep. Truck Drivers Union, Local No. 1*, 611 F.2d 580, 584 (5th Cir.1980) ("However, once the parties have gone beyond their promise to arbitrate and have actually submitted an issue to an arbiter, we must look both to their contract and to the submission of the issue to the arbitrator to determine his authority."). Accordingly, we now examine the arbitration provisions in the collective bargaining agreement and the grievance as submitted by the Union to the Arbitrator to determine the intended scope of the arbitration.

---

4. Because we affirm on this ground we need not address the district court's alternative holding, that the award did not draw its essence from the collective bargaining agreement. Nor do we ex-

press any opinion on the merits of the Arbitrator's interpretation of the contract based on the rights of the Union and non-bus employees.

■ We first consider the parties' agreement. "[T]he question of arbitrability—whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Technologies,* 475 U.S. at 649, 106 S.Ct. at 1418. The agreement here provided only very generally for arbitration of "a grievance or misunderstanding aris[ing] out of and during the term of [the] agreement" provided the grievance is not first resolved by the "joint grievance subcommittee." Collective Bargaining Agreement § 17.1 (filed July 9, 1996 in district court as attachment 1 to defendant's Answer & Counterclaim). The issue the Arbitrator ultimately resolved below—whether the Union or its *non-busing* members have a right to reestablishment of the bus positions—seems to come within the broad class of subjects arbitrable under the agreement. We must next look at the grievance as submitted by the parties to the Arbitrator to determine how it further limits the scope of the arbitration.

The Union commenced the arbitration on July 24, 1992, filing with the Arbitrator a letter addressed to the Hotel's Managing Director which stated that the Union was "opposing and taking to arbitration *the action taken* by your establishment *against the above captioned employee.*" Arbitration Letter (filed Sept. 12, 1997) (emphasis added.) The caption identified the grievant "employee" as "Bus employees/Local 25 members." *Id.* Thus, the letter manifests that the grievance was taken to arbitration only on behalf of the bus employees in Local 25 and not on behalf of the Union itself or of non-bus employees, as the district court concluded.[5]

The Union contends the letter is irrelevant because it is an "informal" document largely ignored by the parties themselves. The Arbitrator, however, apparently considered the letter of significance, describing the nature of

the grievance by reference to it and noting in the first sentence of his original decision that its filing on July 24, 1992 was "on behalf of" each of the individually named grieving bus employees. JA 18. Nevertheless, even without the letter we would be bound to conclude, based on the Arbitrator's decisions, that arbitration was sought on behalf of the named individual grievant bus employees only and that its scope was limited thereby.

■ If there is in fact no written submission to the Arbitrator specifying the issue to be resolved, the scope of arbitration must be determined from the conduct of the parties. *Matteson v. Ryder Sys. Inc.,* 99 F.3d 108, 114 (3d Cir.1996); *International Chem. Workers Union, Local No. 566 v. Mobay Chem. Corp.,* 755 F.2d 1107, 1110 (4th Cir.1985); *Ficek v. Southern Pac. Co.,* 338 F.2d 655, 656 (9th Cir.1964), *cert. denied,* 380 U.S. 988, 85 S.Ct. 1362, 14 L.Ed.2d 280. Here the parties' conduct in pursuing the arbitration, insofar as it is discernible from the Arbitrator's determinations, manifests an intent, at least at the time of the submission and original hearing, to limit arbitration to a resolution of the individual grievants' rights.

The Arbitrator's original decision plainly recites that the grievance was "filed ... on behalf of" the eight named grievants, as we noted above, and that each grievant "was employed as a Bus Employee at the Madison Hotel." JA 18. In the decision the Arbitrator identified the abolition of positions and the layoffs (as well as the transfer of duties) as a single "issue" for which he needed to ascertain a single "appropriate remedy," JA 19. He resolved the issue by recourse to the reasonable expectation of a classification's *laid-off* employees (here the bus employees) that they would be recalled when business improved and the frustration of the expectation "if the classifications completely are eliminated at the time of the layoff." JA 33. Significantly, however, the decision made no mention of the rights or expectations of employees in other classifications not subject to layoff and elimination, such as the non-bus unit employees here on whose rights the

---

**5.** The arbitration letter was filed with this court after oral argument and was not before the dis-

trict court.

Arbitrator based his determination in his final remedial order that the remedy remained in force despite the departure of all of the grieving bus employees. Finally, the remedy the Arbitrator originally fashioned simply directed the Hotel "to reinstate *the Grievants* to their former positions and to make them whole for all losses, including seniority, attributable to their improper layoff." JA 36 (emphasis added). In short the entire focus of the decision was the grievance of the laid-off bus employees. Nothing in the original decision suggests that the Arbitrator or the parties intended the arbitration to extend beyond settling that grievance and fashioning a remedy, if appropriate, for the grievants.

Despite the undisputed and limited scope of his original decision, the Arbitrator purported to construe its language *post hoc* to expand the arbitration to encompass the relief granted in his final award. As noted above, he reinterpreted the statement of issue in the original decision to make reestablishment of busing positions and layoff of the grievants separate issues. In addition, the Arbitrator's February 6, 1995 letter decision concluded that the original remedy "necessarily intended that the Hotel reinstate the Bus Employee classification for the requisite number of positions equivalent to the number of Bus Employee positions which existed before the improper elimination of the classification and the subsequent layoff of the incumbent Bus Employees." JA 39. The June 6, 1996 final order went further and, as we stated earlier, characterized the original decision as having "necessarily found" that "the bargaining unit employees generally"— not only the laid-off bus employees on whose behalf the grievance was expressly brought—had seniority rights in the abolished positions and that the Union, "as the representative of all of the unit employees," had an interest in protecting those rights through arbitration. JA 48. This broad construction of the arbitration's scope is at odds with the Arbitrator's original view that it was limited to the bus employees' grievance—a view he acknowledged in his later two decisions.

In his February 6, 1995 letter, the Arbitrator expressly recognized that "[t]he remedy set forth in the [January 2, 1994] Opinion contemplated reinstatement of, and a make whole award to, the identified Grievants *only.*" JA 39 (emphasis in original). In the same letter the Arbitrator also confirmed that the intent of the parties to the arbitration had been to provide a remedy for the grievant employees alone. *See* JA 39 ("[N]othing in this Arbitration proceeding raised, or was intended to resolve, any issue with respect to any potential remedy to any individuals other than the identified Grievants."). JA 39. Similarly, in his June 6, 1996 order, the Arbitrator acknowledged that "in finding the violation, [he] balanced Management's right to manage, including the right to determine staffing, against *the Grievants'* seniority rights," not the rights of other employees. JA 48 (emphasis added). It is clear, then, that throughout the proceeding the Arbitrator adhered to the view that he and the parties conducted the arbitration, at least up through the time of the original award, as limited to resolving the grievance filed on behalf of the laid-off bus employees. Given his undisputed perception of the arbitration's limited scope at the time of the initial award, we cannot credit the Arbitrator's subsequent usurpation of authority to arbitrate the rights of non-bus (non-grieving) employees, and through them of the Union itself, and to issue a remedy for the breach of those rights. Such a remedy necessarily exceeds the scope of the arbitration brought and maintained on behalf of the laid off bus employees, as the Arbitrator himself perceived it.

We are aware that an arbitrator's interpretation of the scope of the submission generally receives the same deference accorded his interpretation of the collective bargaining agreement. *See El Dorado Technical Servs., Inc. v. Union General De Trabajadores de P.R.*, 961 F.2d 317, 321 (1st Cir.1992); *Richmond, Fredericksburg & Potomac R.R. v. Transportation Communications Int'l Union*, 973 F.2d 276, 280 (4th Cir.1992); *Pack Concrete, Inc. v. Cunningham*, 866 F.2d 283, 285 (9th Cir.1989); *High Concrete Structures, Inc. of N.J. v. United Elec. Radio & Mach. Workers of Am., Local 166*, 879 F.2d 1215, 1219 (3d Cir.1989); *Ce-*

*ment Divs., Nat'l Gypsum Co. v. United Steelworkers of Am., AFL–CIO–CLC, Local 135,* 793 F.2d 759, 765 (6th Cir.1986). And we have, accordingly, accepted the Arbitrator's original view, as he consistently characterized it throughout, that the arbitration was brought on behalf of and to provide a remedy for the named grievants only—a view that accords with the text of the submission letter and which we must assume reflects the intent of the parties as expressed in their briefs and at the hearing. "Judicial deference to arbitration, however, does not grant carte blanche approval to any decision an arbitrator might make." *Piggly Wiggly Operators' Warehouse, Inc.,* 611 F.2d at 583. "[T]he courts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators." *Matteson,* 99 F.3d at 113. They can and do decline enforcement of awards if an arbitrator exceeds his authority by arbitrating issues not submitted by the parties. *See, e.g., Matteson,* 99 F.3d at 113–15; *Hardin's Bakery, Inc. v. Retail, Wholesale, & Dep't Store Union,* 877 F.2d 1541, 1544–45 (11th Cir.1989); *John Morrell & Co. v. Local Union 304A of the United Food & Commercial Workers,* 913 F.2d 544, 559–61 (8th Cir.1989), *cert. denied,* 500 U.S. 905, 111 S.Ct. 1683, 114 L.Ed.2d 78; *Bowater Carolina Co. v. Rock Hill Local Union No.1924,* 871 F.2d 23 (4th Cir.1989); *Courier–Citizen Co. v. Boston Electrotypers Union No. 11,* 702 F.2d 273, 280–82 (1st Cir.1983); *cf. Davis v. Chevy Chase Fin. Ltd.,* 667 F.2d 160, 164–68 (D.C.Cir.1981) (holding that arbitrator exceeded authority under limited arbitration clause in employment contract). We do so here. We cannot defer to the Arbitrator's ultimate assertion that the arbitration encompassed the abolition of the classification apart from the rights of the named grievants and that his original award "necessarily" contemplated remedies for non-grievants. The Arbitrator's *post hoc* position cannot be "rationally derived" from his contemporaneous view of the parties' submission as limited to the grievants' rights and remedies. *See Richmond, Fredericksburg & Potomac R.R., 973* F.2d at 280; *High Concrete Structures,* 879 F.2d at 1219.

Because the Arbitrator exceeded the arbitral authority conferred by the parties, the judgment of the district court vacating the February 6, 1995 and June 6, 1996 arbitral awards is

*Affirmed.*

RANDOLPH, Circuit Judge, dissenting:

My colleagues believe the arbitrator's remedy—the hotel shall restore the classification it unilaterally abolished—was outside the scope of the arbitration. In support, they point to the union's letter starting the arbitration, and to the arbitrator's initial opinion. I have five points in opposition.

**First,** the union's letter signaling the beginning of arbitration tells us nothing of particular significance. It states that "pursuant to our collective bargaining agreement," the union "is opposing and taking to arbitration the action taken by your establishment against the above-captioned *employee*." Letter from Richardson to Jacques of 7/24/92, at 1 (italics added). Now we know that the grievance was not just for one employee, so right from the start the letter loses any claim to being the definitive guide to the scope of the arbitration that eventually followed.

Little wonder then that the union treats its letter as unimportant. The hotel did so too, and said as much at oral argument. The letter was not before the district court, it was not part of the record before us, and when my colleagues asked for a copy during argument, the parties were not at all sure they could find one.

The complaint, according to the union's letter, is merely "Improper Layoff." *Id.* There is no elaboration, no citation to any part of the labor contract, nothing. How then can one say on the basis of this letter that the arbitrator misinterpreted the scope of the issues? The arbitrator listened to the parties, he read their submissions, he heard their evidence. And he presumably knew the customary manner in which union and management treat such informal proceedings. We decidedly do not.

**Second,** considerations such as those just mentioned are partly behind the settled law that an arbitrator's interpretation of the scope of the issues submitted to him for arbitration gets the same deep judicial bow as an arbitrator's interpretation of a collective bargaining agreement. *See, e.g., Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus.,* 84 F.3d 1186, 1190 (9th Cir.1996); *El Dorado Technical Servs. v. Union General De Trabajadores de Puerto Rico,* 961 F.2d 317, 321 (1st Cir.1992); *Lattimer–Stevens Co. v. United Steelworkers of America, Dist. 27, Sub–Dist. 5,* 913 F.2d 1166, 1170 (6th Cir.1990); *Mobil Oil Corp. v. Independent Oil Workers Union,* 679 F.2d 299, 302 (3d Cir.1982); *Waverly Mineral Products v. United Steelworkers of America Local No. 8290,* 633 F.2d 682, 685–86 (5th Cir.1980). This rule of deference also rests on federal labor policy, judicial economy, and the Supreme Court's directive that "when the subject matter of a dispute is arbitrable, 'procedural' questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator." *United Paperworkers Int'l Union v. Misco,* 484 U.S. 29, 40, 108 S.Ct. 364, 372, 98 L.Ed.2d 286 (1987) (citing *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 557, 84 S.Ct. 909, 918, 11 L.Ed.2d 898 (1964)).

If an arbitrator's interpretation gets the "greatest deference imaginable," *Utility Workers Union of America, Local 246, AFL–CIO v. NLRB,* 39 F.3d 1210, 1216 (D.C.Cir. 1994), I see no plausible ground for setting aside this arbitrator's view of what was before him. Certainly the grievance letter cannot shoulder such a heavy load.

Which brings me to my **third** point. All indications point in favor of the arbitrator's version of the scope of this arbitration. Even if we were on a level, no-deference playing field, I would find the arbitrator's view far more persuasive than the majority opinion's. Consider the context. The hotel did two things: it announced an across-the-board layoff of its bus employees and it abolished the bus classification. Both of the hotel's actions were therefore in play.

The "on behalf of" language—viewed by my colleagues and the district judge as critical—comes from the first paragraph of the arbitrator's initial opinion. Now, it seems to me the person best situated to pronounce on the import of those words is not a judge, but the arbitrator who wrote them. And here is what the arbitrator thought. From the second paragraph of his opinion onward, the arbitrator treats the hotel's unilateral abolishment of the bus employee position as a chief topic of dispute between the parties. This is compelling evidence of what the parties believed they were arbitrating. A court cannot rightly claim to be giving deference to an arbitrator when it reaches out so far to overturn him.

My **fourth** point is that to restrict the scope of arbitration to the union's opening grievance letter is to adopt a formal arbitration pleading requirement, judicially monitored—something like, "The scope of the union's first letter defines the scope of the arbitration." Yet I had thought informality was one of the hallmarks of this sort of non-judicial dispute resolution. The approach my colleagues adopt, if it were to have any lasting impact (I cannot imagine that it will), means that no longer will the arbitrator hear the parties out, consider the evidence they wish to present, and make a considered determination of the scope of the issues before him. Instead he will examine only the initial grievance letter, much in the manner of a common law judge in Blackstone's time. Such a regime, I can say with no exaggeration, flies in the face of, contradicts, deviates from, upsets, disregards, conflicts with, tosses aside, ignores and repudiates a large portion of the law of labor arbitration from the *Steelworkers Trilogy* on down.

Indeed, such a regime would impose upon arbitration practice procedural requirements even stricter than the more formal rules governing the trial of a federal civil case. Consider Federal Rule of Civil Procedure 15(b): "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Here the union and the hotel "tried" the issue of the classification abolishment and the arbitrator issued his findings and conclusions about that issue in his initial

award. And so, if this had been a district court case, the union's grievance letter—its "complaint"—would be deemed to have raised that issue. It is utterly incomprehensible that arbitration proceedings should be more regimented.

This brings me to my **fifth** and final point. My colleagues say that the arbitrator's remedy of restoring the bus classification fell outside the issues the parties arbitrated and came about only "*post hoc.*" This is doubly mistaken. In his initial award the arbitrator held, for instance, that "the Hotel violated the layoff, seniority and classification provisions of the Agreement ... insofar as it eliminated completely the Bus Employee classification, laid off all of the Bus Employees and transferred the substantial remaining Bus Employee duties to the Waiters .... Consequently, the Hotel is directed to restore the Bus Employee position, to reinstate the laid off Bus Employees and to make them whole for all losses attributable to the improper layoff." J.A. 31. Having found, as an initial matter, that the hotel violated the contract by eliminating the classification, the arbitrator simply followed elementary logic in ordering the hotel to restore the classification. It is an old rule that the scope of the violation determines the scope of the remedy.

The majority's other error is in supposing that the arbitrator's rulings after his initial award may be dismissed as merely "*post hoc.*" After the initial decision, the parties returned to the arbitrator for clarification. Parties sometimes do the same thing in this court. The arbitrator issued an opinion stating that the bus classification had to be restored. Even then the district court did not think the arbitration proceedings had ended and so, at the district court's direction, the parties returned to the arbitrator again for a final ruling and again the arbitrator ordered the hotel to restore the classification. The majority's *post hoc* rationale thus embodies a legal principle—whatever the arbitrator says first in the course of ongoing arbitration proceedings is all that counts. There is probably no need to point out that in all the annals of arbitration law, this marks the first appearance of such a legal principle. If there is something, anything to be said in favor of it, the majority has neglected to enlighten us.