

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-28-1996

# Matteson v. Ryder Sys Inc

Precedential or Non-Precedential:

Docket 95-5821

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Matteson v. Ryder Sys Inc" (1996). *1996 Decisions*. Paper 63.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/63

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 95-5821
_____

GUY A. MATTESON, III; TIMOTHY L. BELL; THOMAS GATI; BRENT E.
ROZELL; LENWORTH BROWN; BARRIS A. CAMERON; CRAIG CANADY,
SR.; MICHAEL CLAYTON; WILLIAM COLON; JOSEPH COURTER; MICHAEL
CRUZ; WILLIE DAVIS, JR.; EARL W. DAWSON; CHARLES W. DUDLEY;
MORDECHAI EPSTEIN; ROBERT E. FEDAK; JOSEPH DEGUIDA; JOSEPH
E. HENRY; VAUGHN L. HURON; DONALD INGRAM; LEVERN JEFFERY;
ROBERT W. LEE, SR.; FREDERICK MADDEN; DONALD MANNING; THOMAS
PATRICK MCGEEHAN; JERRY R. MCINTOSH; JOHN K. MOSLEY; HUGH K.
MULLIN; WILLIAM C. NIXON; ANTHONY OSBORNE; MARK OSTROFSKY;
ROBERT H. PETERSEN; WILLY P. ROJAS; DOMINGOS SANTOS; GARY W.
SEXTON; JAY W. SHARRER; PRINCE A. SNOWDEN; MATTHEW SOWINSKI;
PATRICK A. VENTURA; CARL E. WIGGINS; LANCE A. MCLEE; RONALD
NUNZIANTE; RICHARD RUFF; CHRISTOPHER STOWERS; DANIEL A.
SEBIA; LOCAL NO. UNION 917 OF THE INTERNATIONAL BROTHERHOOD
OF TEAMSTERS; LOCAL UNION NO. 560 OF THE INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, LESTER SMITH

Appellants

v.

RYDER SYSTEM INC; F.J. BOUTELL DRIVEWAY CO; M&G CONVOY INC;
COMMERCIAL CARRIERS, INC.

_____

On Appeal From the United States District Court
for the District of New Jersey
(D.C. Civ. No. 94-cv-04967)
_____


Argued:  June 5, 1996


        Before: BECKER, MANSMANN, Circuit Judges, and
SCHWARZER, District Judge.

(Filed  October 28, 1996)

James A. Scarpone, Esquire (ARGUED)
Brian D. Winters, Esquire
Hellring, Lindeman, Goldstein

& Siegal
One Gateway Center
Newark, NJ   07102-5386

Counsel for Appellants

Irving L. Hurwitz, Esquire (ARGUED)
Vimal K. Shah, Esquire
Carpenter, Bennett & Morrissey
100 Mulberry Street
Three Gateway Center
Newark, NJ   07102

Counsel for Appellees

_____

OPINION OF THE COURT
_____


BECKER, Circuit Judge.

This is an appeal from an order of the district court granting summary judgment for defendant trucking companies in an action by plaintiff owner-operators seeking to set aside a labor arbitration award.  Jurisdiction arises under § 301 of the Labor Management Relations Act.  29 U.S.C. § 185.  The appeal presents the question whether the arbitrators acted within the authority conferred upon them by the parties' agreement, or rather decided issues beyond the parties' submissions.  Concluding that the arbitrators exceeded their authority, we reverse.

I.  Facts and Procedural History

Plaintiffs are 46 truck drivers and two local chapters of their union, Local 560 and Local 917 of the International Brotherhood of Teamsters.  Defendants Ryder Systems, Inc. and related companies ("Ryder" or "company") are engaged in the commercial carriage of automobiles.  Plaintiffs use their own tractors to pull defendants' trailers, delivering cars and light trucks out of Ryder's terminal in Northern New Jersey to new car dealers throughout New England, the Middle Atlantic States, and parts of the Midwest.

At all relevant times, the parties were subject to a collective bargaining agreement known as The National Master Automobile Transporters Agreement ("Master Agreement").  From June 1, 1991, when the Master Agreement went into effect, until August 16, 1994, when the arbitration award that is the subject of this appeal was rendered, the drivers' compensation was governed by the Master Agreement and related leases by which the drivers dedicated their tractors exclusively to Ryder's business.  Payment to the drivers was based on a percentage of the gross revenue paid to Ryder by the shippers.  Despite the fact that the Master Agreement provides that no negotiated agreement between an employer and its drivers shall entitle the drivers to payment of any amount less than 65% of the gross revenues the employer

receives from a shipper, the lease agreements provide that drivers receive 60% or 61% depending on the number of vehicles shipped. It was the lease agreements that determined the drivers' share. The agreement (and practice under the lease) further makes clear that the drivers were to be reimbursed for the full amount of all tolls they actually paid.

The Master Agreement and the related leases also included a "toll schedule," which (very roughly) represented an average of the tolls that would be incurred on a trip from Ryder's terminal to certain broadly defined geographical areas encompassing entire states or groups of states. Prior to calculating the driver's share, Ryder would deduct from the gross revenue the amount specified by the toll schedule for the particular trip. At some point, Ryder unilaterally (and in the drivers' submission, arbitrarily) increased this toll schedule, retroactive to April 1992. In so doing, Ryder decreased the base (gross revenue) from which the drivers' share was calculated, thereby decreasing payments to the drivers. Ryder's actions precipitated the dispute that is now before us.

In addition to concern over changes in the toll schedule, a number of drivers discovered instances in which Ryder paid them 60% of the gross revenue when, in their opinion, they were entitled to 61%. Those drivers invoked the grievance machinery of the Master Agreement. In the initial grievance (the "Matteson grievance"), they complained that Ryder's actions with respect to the toll schedule and the gross revenue share calculations had violated "Addendum 'C'" and "Exhibit 'B'" of the lease agreements. Addendum C of the lease agreements establishes the toll schedule for trips originating from the Port Jersey terminal; Exhibit B assigns the threshold number of cars a driver must transport to receive 61% rather than 60% of the company's gross revenue.

When members of Local 560 learned that they were also being charged increases in the toll schedule and that the increases were effective retroactively to April 1992, their shop steward, Fred Worth, submitted a "class action" grievance on behalf of the drivers (the "560 grievance"). The written grievance identified the subject matter in the following language:

"TO WHOM IT MAY CONCERN
I FIND THE COMPANY IN VIOLATION OF ARTICAL [sic] #49 OF THE MASTER AGREMENT [sic]. I ASK FOR ALL MONIES TO BE RETURN [sic] TO DRIVERS AFECTED [sic] AND A CEASE AND DESIST.

SECTION 4 A, C SECTION 5 TOLLS"

Article 49 of the Master Agreement, entitled "Owner-Operator," covers a broad range of issues including, but by no means limited to, toll charges and revenue shares. Section 4(a) of Article 49 deals with the revenue share for the driver and requires that the drivers receive no less than 65% of the gross revenue. Section 4(c) of Article 49 ensures that any increases in the payments Ryder receives will be reflected in the drivers'

receipts, and briefly mentions tolls.  Finally, Section 5 delineates the payment responsibilities as between the drivers and Ryder, including the responsibilities for "turnpike fees, road tolls and bridge tolls."  Larry Ervin, Ryder's Director of Labor Relations, has acknowledged (in his October 31, 1994 Affidavit) that "[r]epresentatives of Locals 560 and 917 advised me that this grievance protested the changes the April 1992 ancillary schedule made to the February 1991 schedule."

The Local 560 grievance together with the Matteson grievance were heard before the Joint Committee.  See supra note 2.  On a pre-hearing information form, used by the Joint Committee "as a preliminary general statement of [the parties'] position[s]," Daniel Coughlin, a union representative, set forth the basis for the unions' grievance before the Joint Committee. Under the section entitled "Circumstances of the Dispute," Coughlin typed "XXX" on the appropriate line to indicate a "Back Pay Claim" and typed "TOLLS" on the line to indicate "Others." He also noted that the relevant sections of the Master Agreement about which he was concerned were "ARTICLE 49, SECTION 4A, 4C SECTION 5, ARTICLE 49, SECTION 14."  Section 14 of Article 49 states that no lease entered into pursuant to the Master Agreement may conflict with the Master Agreement.

In an additional, undated submission to the Joint Committee, Coughlin attempted to explain more clearly the grievance he was pursuing.  He wrote almost exclusively about the toll increases, noting that each lease agreement had a toll schedule and that "[t]he toll charges have been raised dramatically by the Company and they raised these charges with no explanation or substantiating paper work reflecting why the charges are raised."  In a further, also undated submission, Coughlin quoted from the Master Agreement the provisions on which the unions' grievance is based.  He cited the same provisions as those cited on the pre-hearing information form.

The minutes of the hearing itself, though unfortunately not transcriptions, further inform the reasons for the grievance. Coughlin began the argument over the merits of the grievance by discussing the increases in the toll schedules.  He went on to object to the "entire structure."  (No explanation is provided as to what that phrase refers.)  Local 917 joined in protest of the manner in which Ryder was charging the unions for tolls.  In response, Ervin referred to the documents submitted by the unions and claimed that those same documents allowed Ryder to implement increases in the toll structure.

Without deciding the matter, the Joint Committee referred the grievance back to the parties for negotiations to be completed within sixty days.  When the parties could not reach an agreement, the unions requested, by letter, that the Joint Committee re-hear the case.  In the letter, Coughlin again importuned the Joint Committee to hold the increase in the toll schedule to be in violation of the Master Agreement.  Coughlin also maintained that the original toll charge, presumably the toll schedule itself, was in violation of the Master Agreement.

The Joint Committee re-heard the grievance.  Al Valle, on behalf of Local 560, reported to the Joint Committee that

"[i]t is the position of the locals that the Company illegally raised the toll tariffs and requests that they be rescinded and to be made whole for all increases made at the time it was initiated."  Jack Shea, on behalf of Local 917 "agreed that this was the position of both locals."  Finally, Ervin, on behalf of Ryder, began by noting that the original grievance included complaints about the percentage of gross revenue to which the drivers were entitled.  Through discussions, however, the parties narrowed the issue to the toll increases.  Ervin went on to state, inter alia,

> What is at issue is the increase in the tolls hold back which was instituted in 1992.

and,

> Now the grievance indicates that the only issue is that the leases remain the same.  There is no protest regarding the percentage; that all they want to do is protest the toll increase that was implemented in 1992.  That is the current case.

At the close of the hearing, the case was referred to a subcommittee comprised of one union representative and one management representative.  Prior to the referral, the Joint Committee instructed the parties to provide the subcommittee with the previous toll schedule; the toll schedule in dispute; any and all documents justifying the toll schedule increase; and, a description of what is contained in the toll schedule.  Based upon the report of the subcommittee, the full Committee made the following decision:

1.  All owner operators will receive 65% of the revenue received by the Company beginning July 18, 1994.

2.  An ancillary charge of $13.35, which has been justified, will be charged on both the headhaul and backhaul.

3.  The Company will convert to a single factor tariff concept, with drivers paying their own tolls with no Company reimbursement.  This will eliminate the Company's toll holdback system.

4.  The Company is directed to pay the difference between the two (2) toll schedules in question for all owner operators party to this grievance beginning April 1, 1994.

5.  This decision resolves all

outstanding grievances on all related issues.

6. The Committee finds that because the Company failed to respond in a timely manner to the wage reviews filed by grievants Matteson, Gati and Rozell, these claims are upheld for the full amounts claimed, consistent with Article 7.

7. This settlement should set no precedent for any other cases.

The drivers responded to the Joint Committee's ruling by filing a complaint in the District Court for the District of New Jersey. The relevant count in the complaint for present purposes is Count I, which contended that the arbitration award should be vacated because the arbitrators went beyond the scope of the submissions to reach their conclusion and the ultimate award, on its merits, did not draw its essence from the collective bargaining agreement. Of particular concern to the drivers was the imposition of the ancillary charges from Paragraph 2 of the award. The drivers moved for summary judgment as to Count I; Ryder responded with a cross motion for summary judgment.

The district court granted Ryder's motion. It began its discussion by noting the extreme deference a court is to afford an arbitrator's decision, including the interpretation of the scope of the arbitrator's own power under the collective bargaining agreement and/or the parties' submissions. Quoting United Transportation Union Local 1589 v. Suburban Transit Corp., 51 F.3d 376 (3d Cir. 1995), the court stated that "'there must be absolutely no support at all in the record justifying the arbitrator's determinations for a court to deny enforcement of an award.'" Id. at 379 (quoting News America Publications, Inc. v. Newark Typographical Union, Local 103, 918 F.2d 21, 24 (3d Cir. 1990)). The court then went on to examine the submissions to the arbitrator and concluded that the submissions covered a range of issues including, but by no means limited solely to, the toll schedule. Therefore, it reasoned, the submission supported the Joint Committee's interpretation of the scope of its power.

The district court next examined the arbitration award itself to determine if it "[drew] its essence from the collective bargaining agreement." United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597 (1960). Relying again on the forgiving standard of review as set forth in Suburban Transit, the court concluded that the arbitration award represented an arguably reasonable interpretation of the Master Agreement. It therefore held that the decision of the Joint Committee as to the merits of the grievance should not be disturbed.

II. Standard of Review

Because we review a district court decision that itself

reviewed an arbitration award subject to a particular standard, it is fitting to elaborate just a bit on our usually brief statement concerning the correct standard of review. In Mobil Oil Corp. v. Independent Oil Workers Union, 679 F.2d 299 (3d Cir. 1982), we stated that the standard for reviewing an arbitrator's interpretation of the collective bargaining agreement should be the same as that for reviewing an arbitrator's interpretation of the issue submitted. See id. at 302. In Exxon Shipping Co. v. Exxon Seamen's Union, 73 F.3d 1287 (3d Cir.), cert. denied sub nom. Seariver Maritime, Inc. v. Exxon Seamen's Union, 116 S. Ct. 2515 (1996), we noted that we apply the same standard in reviewing the district court's decision as that court did in reviewing the arbitrator's interpretation of the collective bargaining agreement. See id. at 1291. Therefore, our review of the validity of the arbitration award must be subject to the same standard as that which governed the district court's review.

Under the Federal Arbitration Act, a district court may vacate an arbitration award if, inter alia, "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). In other words, an arbitrator may not venture beyond the bounds of his or her authority. See United Steelworkers, 363 U.S. at 597 – 98. As is often the case, the authority of the arbitrator is defined not simply by the collective bargaining agreement, but is determined in large measure by the parties' submissions. See, e.g., Sun Ship, Inc. v. Matson Navigation Co., 785 F.2d 59, 62 (3d Cir. 1986). In such cases, then, it follows that an arbitrator has the authority to decide only the issues actually submitted. SeeUnited Parcel Serv., Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union No. 439, 55 F.3d 138, 142 (3d Cir. 1995) ("[A]n [arbitration] award will, of course, be enforceable only to the extent it does not exceed the scope of the parties' submission."); see also United Steelworkers, 363 U.S. at 598 (upholding an arbitration award but implying that were the award "beyond the submission" it would have been vacated). It is the responsibility of the arbitrator in the first instance to interpret the scope of the parties' submission, but it is within the courts' province to review an arbitrator's interpretation. See, e.g., Mobil Oil, 679 F.2d at 302.

We must now determine the appropriate standard for our review of that interpretation. We are not writing here on a blank slate. In Mobil Oil, we wrote that "the deference that is accorded to an arbitrator's interpretation of the collective bargaining agreement should also be accorded to an arbitrator's interpretation of the issue submitted." 679 F.2d at 302. We provided three reasons for such deference, which results in "singularly undemanding" judicial review. United Transp. Union, 51 F.3d at 379 (quoting News America, 918 F.2d at 24). First, a more searching judicial review of submissions to an arbitrator would undermine the congressional policy of promoting speedy, efficient, and inexpensive resolution of labor grievances. SeeMobil Oil, 679 F.2d at 302. Second, interpretation of a

submission must often occur in the context of the collective bargaining agreement itself. Therefore, it would be inconsistent to accord deference to the interpretation of the collective bargaining agreement but not to the submission. See id. Finally, requiring courts to engage in a close examination of the submissions to arbitrators would put a considerable strain on judicial resources. See id.

Given the language employed to describe the standard for reviewing an award on the merits, there is no doubt that our review of the interpretation of a submission is highly deferential. See, e.g., News America, 918 F.2d at 24 ("[T]here must be absolutely no support at all in the record justifying the arbitrator's determinations for a court to deny enforcement of an award.") (emphasis added); Ludwig Honold Mfg. v. Fletcher, 405 F.2d 1123, 1128 (3d Cir. 1969) (upholding an arbitrator's award so long as its "interpretation can in any rational way be derived from the [collective bargaining] agreement") (emphasis added).

Effusively deferential language notwithstanding, the courts are neither entitled nor encouraged simply to "rubber stamp" the interpretations and decisions of arbitrators. See,e.g., Leed Architectural Prods., Inc. v. United Steelworkers of America, Local 6674, 916 F.2d 63, 65 (2d Cir. 1990) ("This great deference, however, is not the equivalent of a grant of limitless power."). Courts still maintain a significant role in the labor arbitration process; they have not been relegated to the status of merely offering post-hoc sanction for the actions of arbitrators. Rare though they may be, there will be instances when it is appropriate for a court to vacate the decision of an arbitrator. This is one of them.

III. Did the Arbitrators Exceed Their Authority?

We turn to the ultimate decision of the Joint Committee to determine if it went beyond the scope of the authority conferred upon it by the parties. As we have noted, an arbitrator has the authority to decide only the issues actually submitted. See, e.g., United Parcel Serv., 55 F.3d at 142. We are hampered in the effort to define the issues submitted by the failure of the parties in this case to prepare a single document containing the issues they wished to submit to the Joint Committee. Instead, we are confronted with a tangle of documents, penned over a two-year time period, no single one of which is dispositive and many of which are hand written, incomplete, and obviously drafted without expert assistance.

The obvious first step is to prescribe the relevant time frame. Must we consider all of the documents during the entire two years of the dispute, or should we study only those documents generated at or near the time of the final hearing? Precedent sheds little light on this question, because in the usual arbitration the parties formulate a single, controlling submission. See, e.g., Sun Ship, 785 F.2d at 62. Reasoning from the general principles set forth in that precedent, we can, however, answer the question.

"[A]rbitration is a creature of contract." United Steelworkers of America v. American Mfg., 363 U.S. 564, 570 (1960) (Brennan, J., concurring). Though spoken in the context

of interpreting the collective bargaining agreement, Justice Brennan's simple description aptly frames our inquiry. As in contract law, the touchstone for interpreting a submission must be the intention of the parties. See Local 1199, Drug Hospital and Health Care Employees Union, RWDSU, AFL-CIO v. Brooks Drug Co., 956 F.2d 22, 25 (2d Cir. 1992). It is the parties, not the arbitrator, who decide the issues submitted; absent a formal, written submission, we must look to the parties' conduct as a whole. See International Chemical Workers Union, Local No. 566 v. Mobay Chemical Corp., 755 F.2d 1107, 1110 (4th Cir. 1985). To determine the intent of the parties given the circumstances in this case, then, we cannot limit ourselves simply to one or a few documents. Nor can we rely on isolated statements within those documents. Rather, we must examine the documents with an eye towards arranging each of them to create a complete picture.

When we examine the entire history of the grievance in this case, it becomes patent that the issue the parties ultimately agreed to submit to the Joint Committee was the increase in the toll schedule. The drivers did draft documents and made statements that, if taken out of context, could be construed as referring to issues beyond the toll schedule, especially in the early stages of the dispute. Some documents referred to the percentage of gross revenue due the drivers; more documents referenced provisions of the Master Agreement that governed issues well beyond toll payments. As the dispute progressed, however, the drivers ceased to mention the gross revenue percentages. And, the referenced provisions in the Master Agreement, though often governing a wide range of issues, invariably included references to toll payments.

The only consistent theme running through all the early documents and statements is the increase in the toll schedule. As the dispute progressed further, it became ever more plain that the parties focused their dispute on the increase in the toll schedule. By the time of the last hearing before the Joint Committee, it was the toll schedule, and nothing more, over which the parties argued. The clearest statement of the dispute, in fact, comes from Ervin, the Ryder representative, who reported to the Joint Committee that "all [the drivers] want to do is protest the toll increase."

The drivers maintain that the request of the Joint Committee to have the parties provide information about the toll schedule is important. We agree that the request is important, but, as the district court stated, it is not dispositive. But the fact that the Joint Committee requested only information about the toll schedules suggests that, at the time of the final hearing, the Joint Committee believed that the only issue the parties wished to submit to it was the toll schedule. The request is, in other words, support for our conclusion that the intent of the parties was to arbitrate only the increase in the toll schedule.

Ryder and the district court emphasize isolated statements and documents without contextualizing them. As we have explained above, such a narrow focus is inappropriate in this case. Ryder and the district court attach too great

significance to documents drafted early in the dispute that contain references to the percentage of gross revenues due the drivers. Similarly, both Ryder and the district court devote much attention to references to provisions in the Master Agreement that discuss issues beyond the toll schedules. Such attention is especially misplaced when other language in those documents makes clear that what the drivers were concerned about was the tolls.

For example, both Ryder and the district court point to a letter Coughlin, a union representative, wrote that quotes from the Master Agreement. In that same letter, however, he wrote almost exclusively about the toll schedules. Additionally, both Ryder and the district court correctly point out that in the minutes before the Joint Committee Coughlin "not only protests the raise, but the entire structure." However, the surrounding language in the minutes, which referred only to the toll schedule, makes it obvious that this reference to "the entire structure" is not a reference to the entire compensation scheme.

Finally, Ryder observes that, when Ervin stated that the only matter before the Joint Committee was the increase in the toll schedule, Coughlin did not agree, but rather raised a point of order. Ryder claims that if the drivers truly did wish to arbitrate only the increase in the toll schedule their representative would have said as much at this point in the proceedings. However, just as significantly, Coughlin did not object to Mr. Ervin's characterization of the dispute. Moreover, the point of order appears directed not at the characterization but at the argument Ervin proceeded to make about the merits of the dispute.

## IV. Conclusion

Because the Joint Committee exceeded its authority as arbitrator by deciding issues not submitted to it by the drivers and Ryder, we will reverse the order of the district court and remand the case with instructions to vacate the entire arbitration award pursuant to 9 U.S.C. § 10(a)(4). It is unnecessary to reach the merits of the arbitration award and we do not make a determination as to whether the award drew its essence from the collective bargaining agreement.