

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-2-2005

# Metromedia Energy v. Enserch Energy Ser

Precedential or Non-Precedential: Precedential

Docket No. 04-1944

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Metromedia Energy v. Enserch Energy Ser" (2005). *2005 Decisions*. Paper 930.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/930

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

<u>PRECEDENTIAL</u>

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 04-1944

METROMEDIA ENERGY, INC.

v.

ENSERCH ENERGY SERVICES, INC.; TXU ENERGY
COMPANY LLC;
TXU ENERGY TRADING; TXU ENERGY SERVICES,
n/k/a
TXU ENERGY RETAIL COMPANY, LP; TXU JOHN
DOES


TXU ENERGY SERVICES, n/k/a TXU ENERGY RETAIL
COMPANY, LP,

Defendants/Third-Party Plaintiffs
v.

METROMEDIA COMPANY,

Third-Party Defendant


Enserch Energy Services, Inc; TXU Energy Company
LLC; TXU Energy Trading; TXU Energy Services,

n/k/a TXU Energy Retail Company, LP,

Appellants


On appeal from the United States District Court
for the District of New Jersey
District Court No.: 03-cv-01561
District Judge: The Honorable Stanley R. Chesler
_____

Argued March 29, 2005

Before: ALITO, SMITH, and ROSENN, *Circuit Judges*

(Filed: June 2, 2005)


COUNSEL:  Robert K. Wise, Esq. (Argued)
          Thomas F. Lillard, Esq.
          Miles B. Haberer, Esq.
          Hunton & Williams, LLP
          Energy Plaza, 30th Floor
          1601 Bryan Street
          Dallas, Texas 75201-3402

          Leda Dunn Wettre, Esq.
          Robinson & Livelli
          Two Penn Plaza East
          Newark, New Jersey 07105-2237
          *Attorneys for Appellants*

2

Phyllis J. Kessler, Esq. (Argued)
Richard S. Last, Esq.
Foreht, Last, Landau & Katz
228 East 45th Street, 17th Floor
New York, New York 10017
*Attorneys for Appellees*

_____

OPINION OF THE COURT
_____

SMITH, *Circuit Judge*.

In this case, we are called upon to review an arbitration award arising out of a dispute between TXU Energy Retail, LP ("TXU") and Metromedia Energy Services, Inc. ("MME") concerning a series of natural gas sales by TXU to MME. The March 3, 2003 arbitration award found that TXU had not overcharged MME for sales of natural gas that took place between November 2000 and February 2001. On April 10, 2003, MME responded to the arbitration award by filing suit against TXU in the District Court for the District of New Jersey. MME sought to vacate the award on the ground that the arbitration panel had exceeded its authority by addressing the reasonableness of TXU's prices for the disputed natural gas sales, after having first found that these sales were not subject to the pricing structure set forth in a 1998 Master Agreement between TXU and MME.

3

The District Court granted summary judgment in favor of MME, holding that the arbitration panel had exceeded its authority by addressing the reasonableness of the prices charged by TXU for sales not governed by the 1998 Master Agreement. The District Court also vacated the arbitration panel's award of attorneys fees, finding that the panel's decision concerning attorney fees "was necessarily based on the panel's inappropriate decision" concerning the reasonableness of TXU's prices. TXU appeals, arguing that the District Court's decision does not reflect the deference due the arbitration panel's award under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16. We agree, and accordingly will reverse the judgment of the District Court and remand with instructions to enter judgment in favor of TXU.

## I.    FACTUAL BACKGROUND

MME is a natural gas retailer that sells natural gas to end users in the northeastern United States. In October 1998, MME entered into a Master Agreement with appellant TXU, another natural gas retailer that undertook to obtain natural gas through a wholesale trading affiliate for delivery to MME. Under this Master Agreement, MME agreed to purchase gas from TXU pursuant to written confirmations that would specify the term, volume, and price for particular purchases. For a period of approximately two years after the signing of the Master Agreement, MME made purchases under the Agreement using written confirmations. MME also, on various occasions, made

purchases of additional quantities of gas, the terms of which were negotiated by telephone with TXU representatives. These telephone transactions related to what the parties refer to as "spot-market" purchases. Spot-market transactions were transactions wherein a specified volume of gas would be ordered by MME for a one-month period only, and the price per dekatherm of such gas would not be provided by TXU until after the gas had been delivered. It also appears from the record that the telephonic spot-market transactions between the parties typically involved shorter lead times between order and delivery when compared to the purchases made by MME from TXU pursuant to the written confirmation process set forth in the Master Agreement.

Article XIV of the Master Agreement contained an arbitration provision indicating that "any disagreement, difference or dispute among the Parties arising under this Agreement shall be resolved pursuant to arbitration according to the procedures set forth in this Article XIV." This arbitration clause called for each party to select one arbitrator, with the two initial arbitrators thus selected jointly selecting a third. The arbitration provision further provided that "[t]he arbitrator shall settle all disputes in accordance with the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association, to the extent that such rules do not conflict with the terms of such Act or the provisions of this Agreement."

In October 2001, MME initiated arbitration proceedings against TXU pursuant to the arbitration clause contained in the Master Agreement. MME claimed that TXU had breached the Master Agreement by overcharging MME for various purchases of natural gas between November 2000 and February 2001. MME's initial statement of claims indicated that the telephonic spot-market purchases referenced above were among the purchases for which MME had allegedly been overcharged. In setting forth its cause of action for breach of contract, MME's statement of claims alleged that "TXU has further violated the Agreement by supplying gas to MME for spot purchases made between November 2000 and February 2001 and subsequently overcharging MME for said purchases." (The parties refer to the period between November 2000 and February 2001 as the "Disputed Period").

TXU responded to MME's claims by arguing that spot-market transactions between the two parties were not governed by the pricing provisions contained in Section 7.1 of the Master Agreement. Instead, TXU argued (in its Second Amended Response) that either (a) the prices for spot-market purchases were established under a separate course-of-dealing contract between TXU and MME; or (b) the course of dealing between TXU and MME had operated to modify the pricing provisions of the Master Agreement insofar as spot-market purchases were concerned.

The parties proceeded to arbitration, which resulted in a

6

March 3, 2003 award in favor of TXU. The arbitration panel found that the spot-market purchases were not governed by the Master Agreement, and were instead subject to a separate "course of performance" contract. The latter arose from the parties' actual dealings, in which, according to the arbitration panel, TXU had charged prices that reasonably reflected market conditions at the time of each spot-market purchase by MME. The arbitration panel also awarded TXU one-third of its attorneys' fees, finding that TXU was the "prevailing party" in the arbitration and thus was the "non-defaulting party" under the attorney fee provision contained in the Master Agreement.

MME responded to the arbitration award by filing suit in District Court. MME sought to vacate the arbitration award on the ground that the arbitration panel, once having determined that spot-market purchases during the Disputed Period were governed by a separate course-of-performance contract, had exceeded its authority by also stating that TXU's prices under that contract were reasonable and accurately reflective of prevailing market conditions. The District Court agreed, holding that the arbitration panel had exceeded its authority by determining the reasonableness of TXU's prices under the course-of-performance contract. The District Court also vacated the arbitration panel's award of attorneys' fees, finding that the panel's decision concerning attorney fees "was necessarily based on the panel's inappropriate decision that TXU's charges were reasonable under [the] spot gas contract. . . ."

7

## II.  ANALYSIS

The District Court exercised diversity jurisdiction over MME's suit pursuant to 28 U.S.C. § 1332.  We exercise appellate jurisdiction over the District Court's final order pursuant to 28 U.S.C. § 1291.

This appeal centers on the question of whether the arbitration panel exceeded the scope of its authority by stating in its written award decision that TXU's sales of spot-market gas to MME during the Disputed Period "were consistently priced and properly reflected market price on the dates volumes were requested and delivered."  MME argued before the District Court that once the arbitration panel determined that TXU's spot-market sales were not governed by the pricing provision contained in the Master Agreement, the panel lacked authority to decide whether TXU's prices under a separate course-of-performance contract were reasonable and fairly reflected market conditions.  MME based its argument on the fact that the Master Agreement's arbitration clause covers "any disagreement, difference or dispute among the Parties *arising under this Agreement*[.]" (Emphasis added).  MME argued that since the parties had agreed only to arbitrate disputes arising under the Master Agreement, the arbitration panel's finding that spot gas transactions during the Disputed Period *were not* governed by the Master Agreement deprived the panel of the

8

authority to address the reasonableness of TXU's prices under an implied course-of-performance contract that lacked an arbitration clause. The District Court agreed with MME, holding that once the arbitration panel had determined that TXU's spot-market sales to MME were not subject to the Master Agreement, the panel's inquiry should have ceased. The District Court reasoned that the issue of whether TXU had or had not breached a separate course-of-performance contract was not a dispute arising under the Master Agreement, and thus was not subject to arbitration.

On appeal, TXU argues that the arbitration panel's award reflects a legitimate exercise of the panel's authority. TXU maintains that the submissions made by the parties during arbitration, taken as a whole, provided a reasonable basis for the arbitration panel to conclude that it was empowered to incorporate into award its findings concerning the reasonableness of TXU's spot-market prices in connection with sales to MME during the Disputed Period. TXU also argues that the District Court's decision fails to reflect the substantial deference owed by a federal court to an arbitration panel's award pursuant to the FAA.

Review of arbitration awards under the FAA is "extremely deferential." *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003). Vacatur is appropriate only in "exceedingly narrow" circumstances, such as where arbitrators are partial or corrupt, or where an arbitration panel manifestly disregards,

rather than merely erroneously interprets, the law. *See id.*; *Local 863 Int'l Bhd. of Teamsters v. Jersey Coast Egg Producers, Inc.*, 773 F.2d 530, 533 (3d Cir. 1985) (stating that error of law is insufficient basis for vacatur). Likewise, an arbitrator's "'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award." *See Major League Umpires Assoc. v. American League of Professional Baseball Clubs*, 357 F.3d 272, 279-80 (3d Cir. 2004) (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)).

Here, MME's challenge to the arbitration award focuses not upon the underlying merits of the panel's analysis, but rather upon whether the panel exceeded its authority by resolving in its opinion an issue the parties had not agreed to arbitrate. The District Court adopted MME's view, predicating its opinion on a provision in the FAA which indicates that an arbitration award may be vacated "if the arbitrators exceed their powers, or so imperfectly execute them that a mutual, final and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). The concerns raised by MME and the District Court arise from the principle that arbitration is a creature of contract, and an arbitration panel has the authority to decide only the issues that have been submitted for arbitration by the parties. *See Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 114 (3d Cir. 1996).

In *Matteson*, we considered the standard of review

10

applicable where a party seeks to vacate an arbitration award based upon allegations that the arbitrators exceeded the scope of their authority by purporting to resolve issues the parties had not agreed to arbitrate. We began by explaining that in reviewing a district court decision concerning the validity of an arbitration award, our assessment of the arbitration panel's actions is governed by the same standard that governed the District Court's review. *See Matteson*, 99 F.3d at 112. Thus, we owe no deference to the District Court's analysis, and instead we exercise plenary review over the District Court's decision to vacate the arbitration award.

In relation to our review of the arbitration award itself, we noted that "an arbitrator has the authority to decide only the issues actually submitted" by the parties. *See id.* at 112-13 (citing *United Parcel Serv., Inc. v. International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America, Local Union No. 439*, 55 F.3d 138, 142 (3d Cir. 1995)). We then stated that "[i]t is the responsibility of the arbitrator in the first instance to interpret the scope of the parties' submission, but it is within the courts' province to review an arbitrator's interpretation." *Id.* at 113 (citing *Mobil Oil Corp. v. Independent Oil Workers Union*, 679 F.2d 299, 302 (3d Cir. 1982)). In determining the appropriate standard for our review of the arbitrator's interpretation of the scope of a submission, we indicated that "there is no doubt that our review of the interpretation of a submission is highly deferential." *Id.* We also rejected the argument that lesser deference should be

11

accorded to an arbitrator's assessment of the scope of his own authority where such an assessment was based upon the arbitrator's factual determinations concerning which issues were actually submitted by the parties. *See id.* at 113 n.6. However, we cautioned that "[e]ffusively deferential language notwithstanding, the courts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators." *Id.* at 113.

We noted in *Matteson* that our efforts to apply this standard of review were hampered by the parties' failure during the course of the arbitration jointly to prepare a single document listing the precise issues they wished to submit to the arbitration panel. *See id.* at 114. Under such circumstances, we held that "absent a formal, written submission, we must look to the parties' conduct as a whole." *Id.* We stated that "[t]o determine the intent of the parties given the circumstances in this case . . . we cannot limit ourselves to simply one or a few documents." *Id.* We also stated that we would not focus upon isolated statements within the documents submitted by the parties, but would instead "examine the documents with an eye towards arranging each of them to create a complete picture." *Id.*

To summarize, *Matteson* indicates that the arbitrators have the authority in the first instance to interpret the scope of the parties' submissions in order to identify the issues that the parties intended to arbitrate. When confronted with an allegation that the arbitrators exceeded their authority by

12

resolving an issue the parties did not intend to submit, we will review the arbitrator's interpretation of the parties' intentions under a "highly deferential" standard. Nonetheless, this deference is not a rubber stamp, and our review must focus upon the record as a whole in determining whether the arbitrators manifestly exceeded their authority in interpreting the scope of the parties' submissions.

MME argues that the arbitration panel's written opinion in support of the arbitration award reveals that the panel exceeded its authority. Where an allegation that an arbitration panel has exceeded its authority is based upon the language of the written opinion in support of the panel's award, our decision in *Roadway Package System, Inc. v. Kayser*, 257 F.3d 287 (3d Cir. 2001), provides additional guidance concerning our inquiry. In *Roadway Package*, after surveying earlier authority addressing such issues, we distilled three basic principles that must guide our review: "(1) a reviewing court should presume that an arbitrator acted within the scope of his or her authority; (2) this presumption may not be rebutted by an ambiguity in a written opinion; but (3) a court may conclude that an arbitrator exceeded his or her authority when it is obvious from the written opinion." 257 F.3d at 301.

With these principles in mind, we turn to MME's challenge to the arbitration panel's award. We must question at the outset the manner in which MME and the District Court have interpreted the panel's written opinion supporting its

13

award. The District Court apparently adopted the view that the arbitration panel had first determined that TXU's spot-market sales to MME during the Disputed Period were governed by a course-of-performance contract, and had then, as a separate inquiry, determined that TXU charged reasonable, market-based prices under this course-of-performance contract. We do not believe the arbitration panel necessarily compartmentalized its analysis in this manner. An alternative reading of the panel's written opinion is that the panel assessed the evidence concerning the prices charged by TXU for spot-gas transactions, found that these prices accurately reflected market conditions at the time, determined that these market-based prices met the expectations of *both parties* at the time of TXU's spot gas sales to MME, and then held, based on the mutual satisfaction of the parties' contemporaneous expectations, that spot-gas transactions were governed by an implied course-of-performance contract rather than by the pricing structure set forth in the 1998 Master Agreement.

Support for this reading flows from the sequence in which the arbitration panel set forth its factual findings on the second and third pages of its opinion. The panel cited testimony from TXU witnesses indicating that TXU intended all spot-gas sales during the Disputed Period to be "at then-current market prices otherwise available for sale and purchase at the specific delivery points[.]" The panel noted that these same witnesses testified that TXU's calculation of the market price for these transactions was based upon information drawn from the spot-

14

gas market indices contained in the industry publications "*Inside FERC*" and "*Gas Daily*." The panel also noted that documentation sent by TXU to MME in connection with these transactions indicated that the prices for spot-gas sales were different than the prices for purchases governed by written confirmations executed pursuant to the Master Agreement. The panel's opinion then discusses the testimony of MME witness Lawrence Morris, who apparently testified that "he recognized that the price for spot gas was not commensurate with the confirmed transaction price for each LDC, but that as long as the price was close to the Gas Daily index price for that period, he raised no objection and ultimately paid the price specified." After describing Morris's testimony in this manner, the arbitration panel's opinion states: "Thus, agreement as to price for spot sales was independent of the Master Purchase Agreement and determined on a month-to-month basis."

When viewed in context, we believe this opening portion of the arbitration panel's written opinion highlights the fact that the panel's findings concerning the market-based nature of TXU's prices were not made as part of an independent inquiry, separate and apart from the finding that a course-of-performance contract rather than the Master Agreement governed TXU's spot-market sales to MME. Instead, these findings were part of the panel's rationale for why it believed a course-of-performance contract existed in the first place. The panel reviewed the evidence in the record, found that TXU had charged market-based prices, found that these market-based

15

prices satisfied MME's expectations, found that MME was aware that these market-based prices differed from the prices that would have arisen under the Master Agreement's pricing provisions, found that MME raised no contemporaneous objection to these prices, and concluded based on these findings that the parties had intended to calculate the price for spot-gas sales on a month-to-month basis, independent of the pricing structure contained in the Master Agreement. In this context, there is no support for the District Court's view that the arbitration panel somehow exceeded its authority by following this chain of reasoning in the course of rejecting MME's breach of contract claim and concluding that TXU had not breached the Master Agreement.

We recognize, of course, that both MME and the District Court may have interpreted the arbitration panel's opinion as having first found that a course-of-performance contract existed, and only then having moved on to address the reasonableness of TXU's prices under this separate contract. This interpretation does not entirely make sense, because it seems more logical to believe that the arbitration panel first made its findings concerning what the parties' course of performance actually was, and then considered whether this course of performance reflected mutually-held expectations such that it could be said to constitute a separate contractual arrangement independent of the Master Agreement. It is not possible for us to say with complete certainty which interpretation most accurately captures the actual intentions of the arbitration panel. However, we find that

16

the interpretation discussed at length above is a reasonable reading of the arbitration panel's written opinion. Given this fact, the District Court was wrong to seize on a contrary reading and to invoke that reading as a basis for concluding that the arbitration panel exceeded its authority. The District Court's approach runs afoul of the core principles identified in *Roadway Package*, which held that "a reviewing court should presume that an arbitrator acted within the scope of his or her authority" and that "this presumption may not be rebutted by an ambiguity in a written opinion." *See Roadway Package System, Inc.*, 257 F.3d at 301.

Moreover, even if we were to adopt the District Court's interpretation of the arbitration panel's written opinion, we would still uphold the panel's award. Here, as in *Matteson*, the parties failed to submit to the arbitrators a single comprehensive document listing the precise issues that the arbitrators were being asked to resolve. Thus, if we were to assume that the arbitration panel's findings concerning the reasonable, market-based nature of TXU's spot-market prices were not simply part of the panel's rationale for rejecting MME's claim that the Master Agreement applied to spot-market transactions, we would review the record as a whole to determine whether the arbitration panel reasonably believed the parties had submitted to it the issue of whether TXU's spot-market prices reasonably reflected prevailing market conditions. *See Matteson*, 99 F.3d at 114. While our review of such issues cannot be a "rubber stamp," it is clear that we must take a "highly deferential"

17

approach in considering whether an arbitration panel has reasonably interpreted the scope of the parties' submissions. *See id.* at 113.

We believe the record as a whole provided an adequate basis upon which the arbitration panel could conclude that it was empowered to address the reasonableness of TXU's spot-gas prices in the event that a course-of-performance contract rather than the Master Agreement governed the parties' spot-gas transactions. The "Causes of Action" section in MME's initial Statement of Claims alleged that "TXU has further violated the [Master] Agreement by supplying gas to MME for spot purchases made between November 2000 and February 2001 and subsequently overcharging MME for said purchases." This section does not reference Appendix I of the Master Agreement, which defines the "Contract Price" for purposes of sales governed by the Agreement. Thus, both TXU and the arbitration panel may reasonably have believed that MME's overcharge allegations were predicated upon multiple factors depending upon the specific sales in question. Certainly, it is clear from the record that TXU believed that the issue of whether its spot-gas prices reasonably reflected market conditions was implicated by MME's claims, and thus was before the arbitrators. For example, TXU's pre-arbitration brief described the testimony TXU intended to elicit during the arbitration hearing. Among other things, TXU stated that its testimony would establish that "as is customary in the natural gas industry, TXU Energy often purchased this spot gas on the

18

open market, delivered the gas to MME *and charged MME a market-based price for the gas*." (Emphasis added). A later subheading near the conclusion of the same brief asserted that "[t]he price charged by TXU Energy for spot gas was both market-based and consistent with the parties' course-of-performance." In support of this assertion, TXU indicated that "testimony will amply show that the price charged by TXU Energy to MME for spot gas during the relevant time period was based on the parties' course-of-performance and was well within the market price ranges published in both *Inside FERC* and *Gas Daily*."

Consistent with its pre-hearing brief, TXU apparently introduced testimony during the course of the arbitration concerning the extent to which the prices for its spot-market sales to MME were consistent with prevailing market conditions as reflected in the leading industry pricing indices during the Disputed Period. TXU discussed this testimony in its post-hearing briefing, focusing primarily upon testimony provided by one of TXU's expert witnesses, and arguing based on this testimony that "there is almost always a range of reasonableness and not just a single number that can be reasonable," and that the prices for TXU's spot-market sales to MME fell within this range. TXU's post-hearing brief also discussed documentary evidence in the form of letters sent by MME to various MME customers during 2001, in which MME defended its recent price increases by noting that market prices for natural gas had risen substantially during the prior months. TXU argued that these

MME letters established three key facts: "(1) [that] MME, and not just TXU Energy, was justifying its spot gas prices based on the *Gas Daily* index range, which reflects the market; (2) [that] the market had spiked dramatically due to weather; and (3) [that] the $23.00 price was within the market range and therefore reasonable."

Based on the excerpts and testimony discussed above, it appears that TXU believed throughout the arbitration proceedings that MME's claims might implicate the question of whether TXU had charged reasonable, market-based prices for its spot-market sales to MME during the Disputed Period. Notably, at no point during the arbitration proceedings did MME raise the jurisdictional concerns that it now invokes. For example, MME never argued that TXU's repeated references in its opening brief to the market-based nature of its spot-market prices were irrelevant, on the ground that resolving that issue was beyond the scope of the arbitration panel's authority. Nor does MME appear to have objected to the evidence introduced by TXU at the arbitration hearing with respect to the correlation between TXU's spot-market prices and the market-based range of acceptable prices established by the leading industry pricing indices during the Disputed Period. Even when TXU's post-hearing brief made it crystal clear that TXU believed the arbitrators were empowered to address the reasonableness of its spot-market prices during the Disputed Period, MME chose not to send a letter or seek leave to file a reply challenging TXU's submission of an issue that MME had (supposedly) not agreed

20

to arbitrate.

Thus, at the time the arbitration panel crafted its written opinion in support of its award, it was faced with a record in which one party had repeatedly presented evidence and arguments concerning the reasonableness of its spot-market prices under a course-of-performance contract during the Disputed Period, and the other party had never objected to these arguments on the ground that this issue was beyond the scope of the panel's authority. Accordingly, even if we were to adopt the District Court's interpretation of the arbitration panel's written opinion, we would hold that TXU's briefs and hearing testimony, combined with MME's acquiescence to TXU's presentation of the issue, provided the arbitration panel with a reasonable basis to conclude that it was empowered to address whether TXU's spot-market prices under the course-of-performance contract accurately reflected market conditions at the time of the spot-market sales to MME. Therefore, in light of the highly deferential standard of review that we must apply in assessing MME's challenge to the arbitration panel's interpretation of the scope of the parties' submissions, we believe the District Court erred in determining that the arbitration panel lacked the authority to address the reasonableness of TXU's spot-market prices.

Having found that the arbitration panel did not exceed its authority, we also hold that the District Court erred in vacating the panel's award of attorneys' fees to TXU. The arbitration

21

panel found that TXU was the "prevailing party" in the arbitration and thus was the "non-defaulting party" under the attorney fee provision contained in the Master Agreement. MME mounts a broad challenge to this fee award, arguing that even if we reverse the District Court's opinion vacating the substance of the arbitration panel's award decision, we nonetheless should affirm the District Court's vacatur of the fee award. MME argues that the arbitration panel's fee award, pursuant to the Master Agreement's attorney fee provision, "is inconsistent with [the panel's] conclusion that the Agreement did not apply to the parties' dispute."

This argument makes little sense. The Master Agreement's fee provision indicated that "[t]he defaulting Party shall pay all reasonable costs and expenses (including attorney's fees) incurred by the non-defaulting party in the enforcement of its rights under this Agreement, whether incurred through legal action or otherwise." MME initiated arbitration against TXU, and asserted largely unsuccessful claims that TXU had breached the Master Agreement. TXU, in response to MME's initiation of arbitration, filed counterclaims against MME, and recovered $1,830,866.19 in settlement of these counterclaims prior to completion of the arbitration proceedings. Based on these facts, the arbitration panel reasoned that because TXU had successfully defeated the bulk of MME's overcharge claims under the Master Agreement, and had recovered a substantial sum in settlement of its counterclaims filed in connection with the arbitration proceedings, TXU was the "non-defaulting party"

22

under the Master Agreement's fee provision, and thus was entitled to recover its reasonable costs and expenses. Contrary to MME's assertion, the arbitration panel's reliance on the existence of a separate course-of-performance contract, as part of its basis for rejecting MME's overcharge claims under the Master Agreement, is in no way inconsistent with the panel's finding that TXU was the "non-defaulting party" under the Master Agreement's fee provision. Moreover, our review of arbitration awards is "extremely deferential," *see Dhulos*, 321 F.3d at 370, and we must uphold the arbitration panel's award so long as it "draws its essence" from or "arguably construes or applies" the parties' contract, a standard that we are confident is satisfied by the panel's decision here. *See News Am. Pub. v. Network Typographical Union*, 918 F.2d 21, 24 (3d Cir. 1990).

For the foregoing reasons, the decision of the District Court is reversed, and the case is remanded with instructions to enter judgment in favor of TXU.